IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
May 30, 2019 Session

## STATE OF TENNESSEE v. TEROS ANDERSON SWEENEY, ALIAS

**Appeal from the Criminal Court for Knox County**
No. 105506    Steven Wayne Sword, Judge

_____

### No. E2018-00685-CCA-R3-CD

_____

The Defendant, Teros Anderson Sweeney, alias, was convicted of two counts of aggravated assault, two counts of assault, two counts of resisting arrest, and one count of criminal impersonation. The trial court merged various convictions and imposed an effective sentence of ten years' imprisonment to be served consecutively to the Defendant's sentence stemming from a prior federal conviction. On appeal, the Defendant challenges the sufficiency of the evidence related to his aggravated assault convictions, the length of his sentence, and the trial court's imposition of partial consecutive sentences. Upon reviewing the record and the applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, P.J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and ROBERT L. HOLLOWAY, JR., JJ., joined.

Forrest L. Wallace, Knoxville, Tennessee, for the appellant, Teros Anderson Sweeney, Alias.

Herbert H. Slatery III, Attorney General and Reporter; Courtney N. Orr, Assistant Attorney General; Charme P. Allen, District Attorney General; and Randall Kilby, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTUAL AND PROCEDURAL BACKGROUND

The Defendant's convictions resulted from his altercation with a police officer as the officer was attempting to arrest him. The evidence presented at trial established that

at approximately 10:30 p.m. on May 31, 2014, Knoxville Police Officer Darrell Sexton was dispatched to respond to a call regarding a domestic disturbance at an apartment in a local housing development. Officer Sexton, an officer with the K-9 unit, arrived at the apartment one or two minutes after being dispatched and was wearing a K-9 uniform and driving a marked police vehicle.

Officer Sexton knew the male occupant of the apartment from prior interactions and was allowed to enter the apartment. The occupant reported that he had been having problems with "Terry," a guest who had been staying with him. Another man inside the apartment stated that "Terry" had been acting "crazy" and had been trying to fight everyone there. Officer Sexton was escorted to the back porch, which opened into another parking lot, and several people standing outside reported that "Terry" had been acting "crazy" but did not offer any other details.

While Officer Sexton was speaking to those outside the apartment, he saw the Defendant, who met "Terry's" description, peeking at them from around the corner of a building. Officer Sexton went to investigate and saw the Defendant sitting on the step at the end of the building in which the complainant's apartment was located. Officer Sexton asked the Defendant for his name, and the Defendant responded, "Terry." Officer Sexton confirmed that the Defendant was the same person who had been involved in the dispute at the apartment. When Officer Sexton asked the Defendant for his identification, the Defendant said he did not have any identification and identified himself as "Terry Anderson." Officer Sexton testified that the Defendant supplied his date of birth but was "real hesitant" in doing so. The Defendant claimed that he did not have a middle name. He allowed Officer Sexton to pat him down but began moving to prevent the officer from conducting a thorough pat down.

Officer Sexton testified that he asked the Defendant about the complaint in an effort to reach a resolution. The officer requested the Defendant's social security number, which the Defendant provided and the officer wrote down in his notebook. Officer Sexton radioed a request for a warrants check on the Defendant using the name that the Defendant had provided. Officer Sexton stated that when communicating over the radio about any outstanding warrants that a person may have, he liked to keep a twenty-one-foot "reactionary gap" between himself and that person. He explained that because the Defendant appeared to be deceptive and due to fear that the Defendant would attempt to flee, the officer maintained a reactionary gap of six to eight feet between himself and the Defendant. As a result, the Defendant could hear everything that Officer Sexton reported over the radio, but the Defendant never corrected the officer or told the officer that the information the officer reported was incorrect. Officer Sexton received information over the radio that there were no outstanding warrants for the name given to him by the Defendant. Because Officer Sexton believed that the Defendant was being

deceptive, the officer requested that the social security number be checked. Officer Sexton learned that the social security number that the Defendant provided to him belonged to a female who lived at another location. Officer Sexton testified that those who are deceptive in providing their identification typically have outstanding arrest warrants. As a result, he attempted to secure the Defendant until he could ascertain the Defendant's true identity.

Officer Sexton testified that he handcuffed the Defendant's right hand while the Defendant was seated. The Defendant stated that the officer had reported the wrong social security number. The officer told the Defendant that he was under arrest and attempted to place the other handcuff on the Defendant's left hand. The Defendant began resisting, which Officer Sexton said was the typical reaction of someone who had provided a false identity. Officer Sexton stated that the Defendant stood up and that they "kind of danced in a little circle" as the Defendant prevented the officer from handcuffing him. Officer Sexton ordered the Defendant multiple times to put his hands behind his back and to get on the ground, but the Defendant failed to comply. The officer threatened to use a taser on the Defendant, but the Defendant still refused to comply.

Officer Sexton stated that he pointed his taser at the Defendant and threatened to tase him if he continued to resist. Officer Sexton said the Defendant pulled hard and attempted to run. They went around in a circle; Officer Sexton pulled the trigger of the taser twice; and the taser malfunctioned. Once they were facing each other, Officer Sexton was able to get the taser to deploy. One prong of the taser stuck to the Defendant, while the other prong went over the Defendant's shoulder. Officer Sexton testified that as a result, the taser did not employ the full charge so as to incapacitate the Defendant. The officer dragged the Defendant to the ground and attempted to stick the other prong on the Defendant's body to complete the circuit. The officer was not able to do so because the Defendant continued to resist.

Officer Sexton testified that the Defendant's level of resistance increased while they were on the ground. The officer was on top of the Defendant, who continued to twist, pull, and attempt to get away. Part of the taser's wire was wrapped around Officer Sexton's hand; and he only felt a small pulse on occasion; and he determined that the taser was malfunctioning. Officer Sexton placed the taser away from the Defendant and radioed for help. The Defendant grabbed the taser and came at the officer with it, and the officer was able to wrestle the taser away from the Defendant.

Officer Sexton testified that the Defendant then tried to pull Officer Sexton's gun out of its holster. Officer Sexton had a "level three holster" with a "hood" and two buttons that had to be pushed in order to draw the gun. The Defendant pulled on the gun multiple times, and Officer Sexton threatened to shoot him if he did not stop pulling on

the gun.  At one point, the Defendant got up, and the officer was able to take him back down.  The Defendant was much taller than the officer and was able to reach around the officer and grab his gun.  Officer Sexton was able to push the gun back down and pivoted his hips to break the Defendant's grip on the gun.  While they were both on the ground, the Defendant grabbed the gun with both hands and tried to pull it out of the holster.  Officer Sexton yelled for help from onlookers, but no one came to his aid.

Officer Sexton stated that he drew his gun while the Defendant was holding him around the head and neck area.  Officer Sexton brought the gun around with the muzzle close to his face but hesitated due to his concern for the safety to the nearby crowd.  Officer Sexton said that when he hesitated, the Defendant grabbed the end of the gun around the slide and barrel, and they fought over the gun.  Officer Sexton was able to pivot his hips, which broke the Defendant's grip on the gun.  They were on the ground with Officer Sexton on top of the Defendant, and the Defendant put Officer Sexton in a head lock and attempted to choke him.  Officer Sexton fired a round into the Defendant's leg, but the Defendant continued to resist.  Officer Sexton fired a second round into the Defendant's leg, but the Defendant did not react.  Officer Sexton fired a third round into the Defendant's groin, and the Defendant indicated that he no longer wanted to fight but still had Officer Sexton in a headlock.  Officer Sexton ordered the Defendant to let go of him, and the Defendant complied.

Officer Sexton testified that during the struggle, he believed that the Defendant would shoot him if the Defendant got control of the gun.  Officer Sexton explained that he shot the Defendant in the legs because that was the safest shot that he could take without injuring himself or anyone in the crowd.  The altercation was recorded on the video camera in Officer Sexton's vehicle, and the recording was played for the jury at trial.[1]  Other police officers had not yet arrived by the conclusion of the altercation.  Officer Sexton reported to a dispatcher that he was involved in a shooting and that emergency medical personnel were needed.  He instructed the dispatcher to send police officers first to control the crowd, which was becoming increasingly hostile.

On cross-examination, Officer Sexton acknowledged that the Defendant was calm initially and that no weapons were found on the Defendant during the patdown.  Officer Sexton also acknowledged that the recording reflected that he told the Defendant, "I'm going to shoot you," after he had radioed for help.  Officer Sexton explained that the Defendant had picked up the taser and was coming at him with it.  Officer Sexton warned the Defendant again when the Defendant tried to get the gun.  At one point during the

---

[1] Despite our efforts, this court has been unable to view the video recording.  The State noted in its brief its inability to view the video recording in the format in which it was submitted as an exhibit.

- 4 -

struggle, Officer Sexton punched the Defendant in the face. Officer Sexton stated that when he pulled the gun out of its holster, the Defendant grabbed the gun by the barrel.

Mr. Marvin Dixon, who lived across the street from the scene of the altercation, testified that he had heard yelling from across the street prior to the officer's arrival, while Mr. Dixon was sitting on his porch. When the officer's vehicle arrived, Mr. Dixon went inside, retrieved a beer from his refrigerator, and returned to his porch. He saw the officer and the Defendant standing outside beside a porch across the street. Mr. Dixon stated that although it was dark outside, a street light lit up the area so that he was able to see the officer and the Defendant. Mr. Dixon heard the officer state that the Defendant did not have any outstanding warrants and that the Defendant was allowed to leave. Shortly thereafter, Mr. Dixon heard the officer state that the Defendant did have an outstanding warrant and could not leave. The officer placed one handcuff on the Defendant, and they began fighting.

Mr. Dixon stated that he saw the officer and the Defendant arguing and wrestling on the ground. The officer yelled for help, and Mr. Dixon went to the area but backed away once he saw the officer and the Defendant wrestling over a gun. Mr. Dixon said that the Defendant and the officer both had their hands on the gun and that at one point, the Defendant had possession of the gun. Mr. Dixon was concerned for the officer's safety. During the struggle, Mr. Dixon heard a "muffled shot" followed by two loud sounds.

Mr. Dixon testified that a "little kid" was the only other person in the area when the shooting occurred. Following the shooting, people began to gather, yell at the officer, and accuse him of shooting the Defendant while the Defendant was on the ground. Mr. Dixon yelled at the crowd to back up and allow the officer to do his job. Mr. Dixon then ran across the street to retrieve his cell phone in order to call for help but heard other officers and emergency personnel arrive.

On cross-examination, Mr. Dixon testified that he saw the Defendant's hand on "the butt and the trigger part" of the gun and the officer's hand on the Defendant's hand. Mr. Dixon saw the gun come up while in the Defendant's right hand and saw the officer grab the Defendant's wrist and push it down twice, after which shots were fired.

Investigator Charles Terry of the Knoxville Police Department interviewed the Defendant at the hospital the day after the shooting. The Defendant assured Investigator Terry that he was not heavily sedated or in extreme pain. The Defendant waived his rights and agreed to an interview, and an audio recording of the interview was played to the jury.

During the interview, the Defendant acknowledged that his full name was Terry Anderson Sweeney. He said that after his roommate became intoxicated, they argued and that his roommate ordered him out of the apartment and called the police. The Defendant stated that his roommate often threatened to call the police when intoxicated and that the Defendant sat on the neighbor's porch to give his roommate time to settle down. The Defendant said that while he was sitting on the porch, an officer came from around the corner of the building. The officer asked the Defendant for his name and social security number. The Defendant stated that the officer called in the Defendant's information but provided the wrong social security number.

The Defendant stated that the officer approached him while holding a taser and handcuffs and placed one handcuff on him. The Defendant asked if he was being arrested, and the officer told him that he was under arrest because he had provided false information. The Defendant maintained that the officer called in a social security number that differed from the number that the Defendant had provided. The officer told the Defendant that he was going to place the other handcuff on him and walk him to the police car. The Defendant refused and stated that he did not do anything wrong. The Defendant maintained that the officer then tased him, which knocked him down, and that the officer jumped on top of him and tased him again as the Defendant was trying to get up.

The Defendant told Investigator Terry that the officer said, "Don't make me shoot you," and started reaching for his gun. The Defendant stated that he grabbed the officer's wrist and said, "I'm done." The officer ordered the Defendant to get off of his weapon, and the Defendant replied that he did not have the officer's weapon and only had the officer's wrist. The Defendant stated that the officer held his throat, pulled out his gun, and shot him in the leg. By that time, people began to crowd the area. The Defendant said that as he was trying to get up, the officer shot him in the leg a second time, that the Defendant fell, and that the officer shot him again. The Defendant maintained that he was unarmed and lying on the ground when the officer shot him three times.

The Defendant stated that prior to the altercation, he had been drinking his second forty-ounce beer of the day and had consumed liquor. He maintained that he told the officer his name was "Terry Anderson Sweeney" and that the officer called in the name "Terry Anderson" and the wrong social security number. The Defendant stated that if he did not provide the officer with his last name, "it was my mistake." The Defendant denied knowing about any outstanding warrants against him. He agreed that he made a "bad judgment" by standing up after being tased when the officer ordered him to remain on the ground. The Defendant denied attempting to injure the officer but acknowledged making "a couple of bad choices."

The Defendant testified in his own defense at trial and identified Mr. Boisey Robinson as the person who had called the police on the night of the altercation. According to the Defendant, Mr. Robinson became intoxicated on the night of the altercation and began arguing with neighbors outside. The Defendant convinced Mr. Robinson to go back inside of his apartment where Mr. Robinson asked for some of the Defendant's beer. When the Defendant refused, Mr. Robinson cursed him and ordered him to leave. Mr. Robinson then called the police and reported that the Defendant refused to leave Mr. Robinson's home. The 911 operator called back, and the Defendant reported that Mr. Robinson had been drinking. The operator stated that since a domestic disturbance had been reported, an officer had to be dispatched to the apartment.

The Defendant testified that after speaking to the operator, he poured himself a cup of beer, walked out the back door, and sat on a neighbor's porch. Shortly thereafter, Officer Sexton came from the other side of the building and approached the Defendant. The Defendant said he had not seen Officer Sexton arrive earlier, and the Defendant denied peeking around the building at Officer Sexton and Mr. Robinson. The Defendant stated that he told Officer Sexton that his identification was inside the apartment, that his name was "Terry Anderson," and that he did not have a middle name. The Defendant admitted that he did not give Officer Sexton his correct social security number and stated that he did not believe Officer Sexton would conduct a background check. The Defendant denied moving around when Officer Sexton patted him down.

The Defendant testified that after Officer Sexton handcuffed one of his hands, the Defendant pulled his other hand back and asked whether he was under arrest. Officer Sexton informed the Defendant that he was under arrest and that the Defendant provided false information to him. The Defendant stated that he tried to tell Officer Sexton that the officer had reported the wrong social security number over the radio but that Officer Sexton grabbed him, "yank[ed]" him off the steps, yelled at him to get on the ground, and tried to "sling" him to the ground. The Defendant said that they were "just going around in a circle" and that he was "standing [his] ground." Officer Sexton threatened to tase the Defendant. The Defendant stated that "everything just went blank," that he fell to the ground with Officer Sexton on top of him, and that he heard static from the taser and realized that he had been tased. The Defendant said that his body "cl[e]nched[ed]," and that he could not move or hear. He maintained that Officer Sexton tased him a second time and ordered him to get on the ground even though he was already on the ground. The Defendant denied trying to fight the officer.

The Defendant testified that Officer Sexton threatened to shoot him and that the officer put his right hand on his gun while holding the handcuffs in his other hand. The Defendant stated he believed he was going to die and grabbed the officer's wrist to prevent him from pulling his gun out of its holster. He said after he did not comply with

Officer Sexton's commands to let go of his wrist, the officer began punching him in the face. The Defendant's head hit the ground, and he let go of the officer. When the Defendant tried to get up, Officer Sexton slammed him back on the ground. The Defendant stated that Officer Sexton then shot him three times while the Defendant was on the ground and the officer was on top of him and that Officer Sexton turned the Defendant over on his stomach and walked away while the crowd yelled at him. The Defendant denied fighting Officer Sexton over the gun or the taser and denied trying to grab the gun.

The Defendant testified that he told the responding officers that he could not breathe but that one of the officers still put a knee in his back and handcuffed him. He recalled agreeing with the investigator who interviewed him at the hospital that he had used "bad judgment." He explained he was referring to his failure to provide the officer with the correct information and to allow the officer to handcuff him. He denied being combative or hitting Officer Sexton and maintained that Officer Sexton overreacted.

On cross-examination, the Defendant acknowledged that he had two prior theft convictions, a prior robbery conviction, and a prior federal conviction for interference with commerce by robbery. He was on "probation" for the federal conviction at the time of the altercation with Officer Sexton. The Defendant denied that he was aware that he had an outstanding probation violation warrant at the time of the altercation and said he did not learn of the outstanding warrant until the investigator informed him at the hospital.

Although the Defendant acknowledged that he initially refused to allow Officer Sexton to handcuff him, the Defendant testified, "I'm not resisting, I'm just not going down." The Defendant acknowledged that he did not comply with Officer Sexton's order to get on the ground. The Defendant stated that he used "bad judgment" by not complying with the officer's order but asserted that the officer overreacted. The Defendant said he believed he had to defend himself, and he denied giving the officer any reason to believe that the officer had to defend himself.

On redirect examination, the Defendant testified that he was afraid when Officer Sexton threatened to shoot him and that the officer made such threats five times. In response to questioning by the trial court, the Defendant testified that his act of self-defense was grabbing the officer's wrist to prevent him from pulling his gun out of the holster and putting his hand up after the officer pulled out the gun.

Mr. Zackelyn Dobson, a neighbor who testified for the defense, said that on the night of the altercation, he went outside his home when he heard yelling. It was dark outside, and Mr. Dobson saw the Defendant and the officer "scuffling" on the ground.

Mr. Dobson stated that the officer got on top of the Defendant and tased him and that the officer continued to do so even after the Defendant told him to stop. Mr. Dobson stated the officer said, "I'm gonna have to shoot you," and then reached for his gun while he was on top of the Defendant. Mr. Dobson did not see the gun but saw the "fire" from the gun when the officer shot the Defendant. Mr. Dobson believed the officer shot the Defendant twice. Mr. Dobson stated that he never saw the Defendant's hands on the gun or the holster and that he did not see a struggle over the gun.

On cross-examination, Mr. Dobson agreed that because it was so dark outside, he did not see the taser but saw the blue lights from the taser and heard buzzing, which indicated to him that the taser had been activated. Mr. Dobson was unsure whether there was a struggle over the gun, but he saw the flash of the gun when it was fired. On redirect examination, Mr. Dobson testified that he saw the officer's arm go down to the holster and that the Defendant did not put his hands on the officer's hands.

The Defendant was charged in Count 1 with aggravated assault by causing Officer Sexton to reasonably fear imminent bodily injury while using a deadly weapon, in Count 2 with aggravated assault by causing Officer Sexton to reasonably fear imminent bodily injury while displaying a deadly weapon, in Count 3 with aggravated assault by causing extremely offensive physical contact with Officer Sexton while using a deadly weapon, in Count 4 with aggravated assault by causing extremely offensive physical contact with Officer Sexton while displaying a deadly weapon, in Count 5 with resisting arrest through the use of a deadly weapon, in Count 6 with misdemeanor resisting arrest, and in Count 7 with criminal impersonation. The jury convicted the Defendant of two counts of aggravated assault through the display of a deadly weapon as charged in Counts 2 and 4, two counts of simple assault as a lesser-included offense of aggravated assault in Counts 1 and 3, two counts of misdemeanor resisting arrest in Counts 5 and 6, and one count of criminal impersonation as charged in Count 7.

**Sentencing Hearing**

During the sentencing hearing, the State entered the Defendant's presentence report and the certified judgments for his prior convictions as exhibits. These exhibits reflect that the Defendant was convicted in 2002 in federal court of interference with commerce by robbery and brandishing a firearm in relation to a crime of violence and was on supervised release for these convictions when he committed the instant offenses. In April of 2014, a warrant was issued against him for violating the terms of his supervised release by testing positive for marijuana, failing to remain in contact with the probation office, and failing to report as directed. In March 2016, an amended warrant was filed based on the Defendant's arrest and convictions of the instant offenses. The Defendant also had a prior robbery conviction and numerous prior misdemeanor

convictions, including convictions for possession of drug paraphernalia, driving on a revoked license, and theft.

The Defendant made an allocution during which he requested leniency. He stated that his girlfriend, his brother, and his grandparents passed away while he was serving his federal sentence and that his father passed away while the Defendant was in custody for the instant offenses. The Defendant stated he felt guilty because he was not there for his mother when his father passed away. He said he wanted to be there for his mother and others who cared for him.

The trial court found that the Defendant was a Range II, multiple offender with regard to his felony convictions. The trial court also found that the Defendant had a long criminal history, had been on probation which had been revoked multiple times, and was on supervised release for his federal convictions when he committed the instant offenses. The trial court applied the following enhancement factors: (1) the Defendant has a previous history of criminal convictions or behavior, in addition to those necessary to establish his range as a multiple offender; (8) the Defendant, "before trial or sentencing, failed to comply with the convictions of a sentence involving release into the community"; (13) at the time the felony was committed, the Defendant was released on parole, probation, or some form of judicially ordered release; and (19) the Defendant was convicted of aggravated assault against a law enforcement officer who was performing an official duty and the Defendant knew or should have known that the victim was an officer. *See* T.C.A. § 40-35-114. The trial court applied great weight to enhancement factor (19). The trial court also considered mitigating factors and found that none applied.

The trial court merged the aggravated assault and assault convictions into one aggravated assault conviction and also merged the resisting arrest convictions. The trial court sentenced the Defendant to ten years of imprisonment for aggravated assault and six months for resisting arrest and criminal impersonation. The trial court ordered the Defendant to serve his sentences concurrently with each other but consecutively to his outstanding federal sentence, finding that consecutive sentencing was mandatory pursuant to Tennessee Rule of Criminal Procedure 32.

## ANALYSIS

### I. Sufficiency

The Defendant challenges the sufficiency of the evidence supporting his aggravated assault convictions. He maintains that the evidence is insufficient to establish that he displayed a deadly weapon and that the evidence establishes that he acted in self-

defense. The State responds that the evidence is sufficient to support the aggravated assault convictions. We agree with the State.

When a defendant challenges the sufficiency of the evidence, the relevant question for this court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). On appeal, "'the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom.'" *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003) (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Therefore, this court will not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Instead, it is the trier of fact, not this court, who resolves any questions concerning "the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). The burden is then shifted to the defendant on appeal to demonstrate why the evidence is insufficient to support the conviction. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). This court applies the same standard of review regardless of whether the conviction was predicated on direct or circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011). "Circumstantial evidence alone is sufficient to support a conviction, and the circumstantial evidence need not exclude every reasonable hypothesis except that of guilt." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012).

## A. Display of a Deadly Weapon

The Defendant maintains that the evidence is insufficient to establish that he "displayed" Officer Sexton's gun as required to establish aggravated assault. He asserts that Officer Sexton pulled the gun from his holster and that the Defendant never had possession or control of the gun.

As applicable to the present case, a person commits the offense of aggravated assault who "[i]ntentionally or knowingly commits an assault" and the assault "[i]nvolved the … display of a deadly weapon." T.C.A. § 39-13-102(a)(1)(A)(iii) (2014). A person commits assault who "[i]ntentionally or knowingly causes another to reasonable fear imminent bodily injury;" or "[i]ntentionally or knowingly causes physical contact with another and a reasonable person would regard the contact as extremely offensive or provocative." T.C.A. § 39-13-101(a)(2), (3) (2014).

- 11 -

The word "display" is not defined by statute for purposes of aggravated assault. However, "[t]he provisions of the criminal code are to be 'construed according to the fair import of [its] terms.'" *State v. Majors*, 318 S.W.3d 850, 859 (Tenn. 2010) (quoting T.C.A. § 39-11-104 (2006)). This court must give "'[t]he words of the statute … their ordinary and natural meaning,' and we refer to dictionary definitions where appropriate." *Id.* (quoting *State v. Williams*, 690 S.W.2d 517, 529 (Tenn. 1985)). This court has relied on Random House College Dictionary to define "display" as "'to show; exhibit; make visible.'" *State v. Carter*, 681 S.W.2d 587, 589 (Tenn. Crim. App. 1984); *see State v. LaQuinton Brown*, No. E2015-00899-CCA-R3-CD, 2016 WL 3633474, at *8 (Tenn. Crim. App. June 29, 2016).

The Defendant avers that the trial court instructed the jury in response to a question from the jury regarding the definition of "display" posed during deliberations as follows:

> The parties have agreed to present to you the dictionary definition of the word display for your assistance. That definition is: To present, to view, cause to be seen. Whether or not they have possession of a weapon is not required by law, however, to display something, one must do some act causing the item to be presented to view or cause to be seen. The mental intent of the person doing the act of displaying is what the law calls the mens rea of the act. For this offense, the mens rea, or intent, is that the person did the act of displaying knowingly. And the legal definition of knowingly has been previously defined for you.

The record reflects that following a discussion with the trial court outside the jury's presence, the parties agreed to this instruction. However, the record does not reflect that the trial court brought the jury back to the courtroom and provided this instruction to the jury in open court. This court entered an order to supplement the record with the trial court's written response to the jury's question. The trial court held a hearing and entered an order finding that the written response could not be located. The trial court stated that shortly after the parties agreed to the instruction, the jury returned a verdict and that it is unclear whether this instruction was ever provided to the jury. The Defendant does not challenge the procedure employed by the trial court in responding to questions by the jury. Because the record is unclear as to whether the jury was provided with the instruction, we will not consider the instruction in analyzing the sufficiency of the evidence.

Although the Defendant asserts that he never possessed or controlled the officer's gun, the evidence, when viewed in the light most favorable to the State, establishes otherwise. Officer Sexton testified that during the altercation, the Defendant grabbed the

officer's gun numerous times and tried to remove it from its holster. Officer Sexton withdrew the gun to maintain control of it. The Defendant grabbed the gun and struggled with Officer Sexton. Mr. Dixon testified that at one point during the struggle, the Defendant had possession of the gun with his hands on its grip and its trigger. Officer Sexton was afraid that the Defendant would shoot him. We conclude that testimony that the Defendant was in possession of the gun with his hands on the grip and its trigger was sufficient to establish that the Defendant had control of the gun and openly displayed it.

The Defendant contends that the term "display" in the aggravated assault statute is ambiguous and that this court should apply the rule of lenity to resolve the ambiguity. "The rule of lenity is 'rooted in fundamental principles of due process which mandate that no individual be forced to speculate, at peril of indictment, whether his or her conduct is prohibited.'" *State v. Hawkins*, 406 S.W.3d 121, 137 (Tenn. 2013) (quoting *State v. Marshall*, 319 S.W.3d 558, 563 (Tenn. 2010)). When a statute is ambiguous, the rule of lenity requires the ambiguity to be resolved in favor of a defendant. *State v. Smith*, 436 S.W.3d 751, 768 (Tenn. 2014). The rule of lenity "reflects not merely a convenient maxim of statutory construction" but is based on "fundamental principles of due process." *Dunn v. United States*, 442 U.S. 100, 112 (1979). A word or phrase is ambiguous if it "can reasonably have more than one meaning." *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 527 (Tenn. 2010). A statute is ambiguous if the language "is susceptible [to] more than one reasonable interpretation." *Memphis Hous. Auth. v. Thompson*, 38 S.W.3d 504, 512 (Tenn. 2001).

The Defendant has failed to establish that "display" as used in the aggravated assault statute is ambiguous. Rather, as noted by the State, the Defendant attempts to create an ambiguity by arguing that Officer Sexton caused the display of the gun by removing it from the holster. However, the question we are confronted with is whether the Defendant's obtaining control of the gun and placing his hand on the grip and trigger during the struggle was sufficient to show he displayed the weapon, and we conclude it is. Moreover, the Defendant's argument is based upon his claim that he never possessed or controlled the gun, which is contrary to the evidence presented at trial. Rather, we conclude that the rule of lenity does not apply and that the evidence is sufficient to support the Defendant's aggravated assault convictions.

**B. Self-Defense**

The Defendant asserts that the evidence is insufficient to support his convictions for aggravated assault because he was acting in self-defense after Officer Sexton removed his gun from its holster while lying on top of the Defendant. The trial court provided the jury with an instruction on self-defense. A person acts in self-defense who

is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force.

T.C.A. § 39-11-611(b)(1) (2014). The use of force likely to cause death or serious bodily injury may be justified when a person (1) "has a reasonable belief that there is imminent danger of death or serious bodily injury"; (2) "[t]he danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time"; and (3) "[t]he belief of danger is founded upon reasonable grounds." T.C.A. § 39-11-611(b)(2) (2014). The threat or use of force is not justified to resist an arrest that the person using force knows is being made by a law enforcement officer unless: (1) the officer "uses or attempts to use greater force than necessary to make the arrest…" and (2) "[t]he person using force reasonably believes that the force is immediately necessary to protect against the law enforcement officer's use or attempted use of greater force than necessary." T.C.A. § 39-11-611(e)(3) (2014).

The State has the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense. T.C.A. § 39-11-201(a)(3); *State v. Sims*, 45 S.W.3d 1, 10 (Tenn. 2001). Whether the defendant acted in self-defense is a matter for the jury as the trier of fact. *State v. Dooley*, 29 S.W.3d 542, 547 (Tenn. Crim. App. 2000); *State v. Goode*, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997).

The evidence presented at trial, seen in the light most favorable to the State, established that the Defendant escalated the conflict with Officer Sexton. When Officer Sexton attempted to arrest the Defendant, the Defendant pulled away and refused to allow the officer to place a second handcuff on him. The Defendant refused to comply with the officer's numerous commands to place his hands behind his back and get on the ground. The Defendant continued to resist, and Officer Sexton unsuccessfully attempted to tase him. During a struggle, the Defendant obtained the taser and came after the officer with it. The Defendant then tried to remove Officer Sexton's gun from its holster multiple times. After Officer Sexton withdrew the gun to keep it out of the Defendant's control, the Defendant struggled with the officer over the gun. At one point, the Defendant was able to obtain possession of the gun and had his hands on the grip and the trigger. After Officer Sexton was able to regain control of the gun, the Defendant placed him in a headlock and refused to release him until the officer shot him three times. In light of the Defendant's actions, the evidence does not establish that, at the time the Defendant committed the aggravated assault, Officer Sexton used or attempted to use greater force than necessary to make the arrest. Thus, the record supports the jury's finding that the Defendant did not act in self-defense.

## II.  Sentencing

The Defendant contends that the trial court erred in imposing the maximum sentence for aggravated assault and in ordering him to serve his sentence consecutively to his federal sentence.  The State responds that consecutive sentencing was mandatory and that the trial court did not abuse its discretion in imposing the maximum sentence for the aggravated assault conviction.

### A.  Length of Sentence

A trial court's sentencing decisions are generally reviewed for abuse of discretion, with a presumption of reasonableness granted to within-range sentences that reflect a proper application of the purposes and principles of sentencing.  *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012).  A trial court abuses its discretion when it applies an incorrect legal standard, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the party complaining.  *State v. Herron*, 461 S.W.3d 890, 904 (Tenn. 2015).  The court will uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute."  *Bise*, 380 S.W.3d at 709-10.  Even if the trial court "recognizes and enunciates several applicable mitigating factors, it does not abuse its discretion if it does not reduce the sentence from the maximum on the basis of those factors."  *State v. Carter*, 254 S.W.3d 335, 345 (Tenn. 2008).  The trial court is "to be guided by—but not bound by—any applicable enhancement or mitigating factors when adjusting the length of a sentence."  *Bise*, 380 S.W.3d at 706.  Further, "a trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005."  *Id*.  A sentence imposed by the trial court that is within the appropriate range should be upheld "[s]o long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute."  *Id*.  The appealing party bears the burden of proving that the sentence was improper.  *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

In determining the sentence, the trial court must consider:  (1) any evidence received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) the evidence and information offered by the parties on the applicable mitigating and enhancement factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant wishes to make in the defendant's own behalf about sentencing.  T.C.A. § 40-35-210(b) (2012).  "The sentence imposed should be the least severe measure necessary to achieve the purposes

for which the sentence is imposed," and "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant should be considered in determining the sentence alternative or length of a term to be imposed." T.C.A. § 40-35-103(4), (5).

As a Range II, multiple offender, the Defendant was subject to a sentence of six to ten years for aggravated assault, a Class C felony. *See* T.C.A. §§ 39-13-102(e)(1)(A)(ii) (2014), 40-35-112(b)(3). The trial court applied four enhancement factors and sentenced the Defendant to the maximum sentence. The Defendant asserts that the trial court placed too much weight on the enhancement factors in imposing a maximum sentence. However, a claim that a trial court improperly weighed the enhancement and mitigating factors is no longer a ground for appeal. *Carter*, 254 S.W.3d at 344. The record reflects that the trial court considered and applied enhancement factors, found that no mitigating factors applied, and considered the applicable sentencing principles. We conclude that the trial court did not abuse its discretion by imposing the maximum sentence within the Defendant's applicable range.

## B. Consecutive Sentencing

The decision to impose consecutive sentences rests within the sound discretion of the trial court. *State v. Hayes*, 337 S.W.3d 235, 266 (Tenn. Crim. App. 2010). The standard of review for consecutive sentencing is abuse of discretion with a presumption of reasonableness. *State v. Pollard*, 432 S.W.3d 851, 859 (Tenn. 2013). "So long as a trial court properly articulates reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review, the sentences will be presumed reasonable and, absent an abuse of discretion, upheld on appeal." *Id*. at 862. Consecutive sentencing is "guided by the general sentencing principles providing that the length of a sentence be 'justly deserved in relation to the seriousness of the offense' and 'no greater than that deserved for the offense committed.'" *State v. Imfeld*, 70 S.W.3d 698, 708 (Tenn. 2002) (quoting T.C.A. §§ 40-35-102(1), -103(2)).

The trial court ordered the Defendant to serve his ten-year sentence for aggravated assault consecutively to his outstanding federal sentence, finding that consecutive sentencing is mandatory pursuant to Tennessee Rule of Criminal Procedure 32(c)(3)(A). This rule provides:

> When a defendant is convicted of multiple offenses from one trial or when the defendant has additional sentences not yet fully served as the result of convictions in the same or other courts and the law requires consecutive sentences, the sentence shall be consecutive whether the judgment explicitly so orders or not. This rule shall apply: … (A) to a sentence for a felony committed while on parole for a felony.

Tenn. R. Crim. P. 32(c)(3)(A).

The Defendant was on supervised release for a federal felony conviction when he committed the instant offenses. However, this court has held that federal supervised release is not analogous to parole. *State v. Johnny Darryl Williams-Bey*, No. M2002-00950-CCA-R3-CD, 2003 WL 21997741, at \*12 (Tenn. Crim. App. Aug. 21, 2003). In Tennessee, parole is "the release of a prisoner to the community … prior to the expiration of such prisoner's term." T.C.A. § 40-28-102(6). A term of federal supervised release, unlike parole, "'does not replace a portion of the sentence of imprisonment, but rather is an order of supervision in addition to any term of imprisonment imposed by the court.'" *Johnny Darryl Williams-Bey*, 2003 WL 21997741, at \*12 (quoting *United States v. Reese*, 71 F.3d 582, 587 (6th Cir. 1995)). "'[I]t is possible that an individual will have already served the maximum prison sentence allowed under the guidelines before his supervised release even begins.'" *Id.* (quoting *Reese*, 71 F.3d at 588). A violation of federal supervised release could result in an additional prison term. *Id.* Because federal supervised release is not analogous to parole, Rule 32(c)(3)(A) does not apply.

Rather, we conclude that consecutive sentencing was warranted pursuant to Rule 32(c)(2)(B), which provides:

> If, as the result of conviction in another state or in federal court, the defendant has any additional sentence or portion thereof to serve, the court shall impose a sentence that is consecutive to any such unserved sentence unless the court determines in the exercise of its discretion that good cause exists to run the sentences concurrently and explicitly so orders.

*See Johnny Darryl Williams-Bey*, 2003 WL 21997741, at \*14 (applying this provision in upholding the trial court's order the defendant to serve his sentence consecutively to any unserved federal sentence, which included a term of supervised release). Although the trial court did not base its imposition of consecutive sentencing upon this provision, the trial court made additional findings during the sentencing hearing establishing that good cause did not exist to run the sentences concurrently. The trial court found that the Defendant had an extensive criminal history that included convictions for violent offenses, had been on probation on multiple occasions, and had had his probation revoked multiple times. The trial court discussed the aggravated nature and circumstances of the offenses themselves. The trial court also stated that federal authorities likely would implement consecutive sentencing regardless of the trial court's order. *See Justin Rashad Forrest v. Todd Wiggins, Warden*, No. E2014-00978-CCA-R3-HC, 2015 WL 468703, at \*2-3 (Tenn. Crim. App. Feb. 3, 2015) (discussing the difficulty in implementing a trial court's order imposing concurrent state and federal sentences and

recognizing that "[w]hile the trial court has the authority to impose concurrent state and federal sentences, federal authorities have the authority to refuse to implement the trial court's order"). Accordingly, we conclude that the trial court did not err in imposing consecutive sentences.

## CONCLUSION

Upon reviewing the record, the parties' briefs, and the applicable law, we affirm the judgments of the trial court.

---

JOHN EVERETT WILLIAMS, PRESIDING JUDGE